BUTCHERS' SLAUGHTERING AND MELTING ASSOCIATION
*vs.* COMMONWEALTH.

Suffolk. March 2, 1897. — September 8, 1897.

Present: FIELD, C. J., ALLEN, HOLMES, KNOWLTON, MORTON, LATHROP, & BARKER, JJ.

*Eminent Domain — Taking of Easement in Land — Metropolitan Sewerage Act — Evidence — Damages — Special Benefits — Instructions.*

At the trial of a petition for the assessment of damages for the taking of an easement in land under the Metropolitan Sewerage Acts (Sts. 1889, c. 439, and 1890, c. 270), if a witness, who is not a real estate expert and does not know the money value of the petitioner's land, has testified generally to the effect of the taking upon the development of the land and upon its value, it is not error to exclude a question to him as to what percentage of its value a certain strip is affected by the sewer, which strip is the land along the road through which the sewer is laid, and which he has stated will be impaired in value by the taking if it is not adapted to use for a public highway, upon which question of adaptability there is contradictory evidence.

If, at the trial of a petition for the assessment of damages for the taking of an easement in land for the construction of a public sewer, the petitioner contends that the sewer will in a few years become inadequate for the drainage of the territory through which it passes, he shows no ground of exception to the statement of a witness, who has testified in accordance with such contention, that he cannot fix the time within which it will be necessary to make further provision for the drainage, and that it may be within twenty years; nor to the statement of the witness, who is a competent expert, that "both the location and elevation of the new supplementing sewer require it to be put in another place and make a second sewer necessary at a higher elevation and in another part . . . not in connection with this taking."

If an easement taken in land under the authority of the Metropolitan Sewerage Acts (Sts. 1889, c. 439, and 1890, c. 270), is "the right to carry and conduct, under the following described lands, and therein to construct, operate, and forever maintain an underground main sewer and connecting sewers, drains, manholes, and underground appurtenances, and to repair and renew the same," no right to remove the soil from one part of the system of sewers constructed under the statutes to another, in repairing and renewing the main sewer, is included in the taking.

At the trial of a petition for the assessment of damages for the taking of an easement in land under the Metropolitan Sewerage Acts (Sts. 1889, c. 439, and 1890, c. 270), where it is contended only in behalf of the Commonwealth that it is bound by the sanctity of a moral obligation not to abandon the work in question, the petitioner is not entitled to have the jury instructed that the Commonwealth is under no contract or obligation to maintain the sewer through the petitioner's land.

If a sewer is constructed, under the authority of the Metropolitan Sewerage Acts (Sts. 1889, c. 439, and 1890, c. 270), through land in a place which has long been used as a way and is specially adapted to such use, and is located lengthwise through such land, thus rendering it easy and comparatively inexpensive for the owner to drain every part of his land, the jury, in assessing his damages, may find this to be a special and peculiar benefit which may be set off against the damages, although other lands receive similar benefits.

At the trial of a petition for the assessment of damages for the taking of an easement in land under the Metropolitan Sewerage Acts (Sts. 1889, c. 439, and 1890, c. 270), it appeared that a large number of buildings had been erected upon the land designed to be used in killing and dressing animals intended for food, and in rendering into useful products the parts unsuitable for food in their natural state, and that, previously to the construction of the sewer, the drainage from these buildings was conducted into a river. There was evidence from which the jury might have found that the drainage was creating a nuisance; that it would have been impossible for the petitioner to continue using the property in this business if the sewer had not been built; and that the property was much more valuable for this use than for any other. *Held*, that instructions in regard to benefits in reference to this use, from which the jury must have understood that they were to consider benefits to the real estate in view of its adaptedness to the petitioner's business and not benefits to such business, were not open to exception.

PETITION for the assessment of damages for the taking of an easement in the petitioner's land in the Brighton district

of Boston, under the Metropolitan Sewerage Acts, Sts. 1889, c. 439, and 1890, c. 270. After the former decision, reported 163 Mass. 386, the case was tried in the Superior Court, before *Sherman,* J., who allowed a bill of exceptions, in substance as follows.

The rights described in the takings were as follows: " The right to carry and conduct under the following described lands, and therein to construct, operate, and forever maintain an underground main sewer, and connecting sewers, drains, manholes, and underground appurtenances, and to repair and renew the same," the premises therein described being a strip of land 3,295 feet long, through the petitioner's premises in the Brighton district, from Western Avenue to North Beacon Street, containing 81,564 square feet of land, and particularly described by metes and bounds, and shown on plans recorded in the registry of deeds with the takings.

The first taking described a strip of the above length and twenty feet in width, and was filed on March 26, 1891; and the second described certain strips lying by the side of the twenty-foot strip, and was filed on November 7, 1891. These takings were treated as one at the trial.

The petitioner owned a tract of land containing forty-six acres, bounded on the north by the Charles River, on the east by Western Avenue, on the south by Market Street, Wexford Street, and the location of the Boston and Albany Railroad, and on the west by land of one Livermore and by North Beacon Street.

At the time of the trial, the State sewer had been completed through the premises and covered over, and the petitioner had built 1,685 feet of sewer upon its premises, parallel to the State sewer, and connected with it at three different points.

The petitioner called experts, who testified that the injury to the petitioner's land in which the easement was taken was fifteen cents a foot on the average, amounting to $12,225; and that the damage to its remaining land was from $40,000 to $50,000. The principal buildings were especially adapted to slaughtering and melting purposes. There was no evidence of physical injury to the buildings; but one expert testified that their value was depreciated ten per cent by the taking.

The petitioner also contended, and introduced evidence to show, that the various wells on the premises were either dried up or reduced in depth by the building of the sewer; and that it had been forced to expend about $500, to extend the pipes connecting with the water supply of the city, which was already on a part of the premises, to get a supply to take the place of the water from the wells.

The petitioner also claimed damages for the annoyance to and interference with its business occasioned by the work of construction, which obliged it to discontinue the use of the way in which the sewer was constructed, and to use a different and less convenient road for driving in cattle and other purposes; but it was admitted that business went on during the construction without other interruption.

Webster F. Warren, called as a witness by the petitioner, testified that he was treasurer of the petitioner corporation, and had been such since 1873; that the petitioner's buildings, eleven or twelve in number, were mostly built in 1872 and 1873, the last building being completed in 1880; that the construction of the sewer was begun in April, 1891, on the North Beacon Street side, and in August, 1891, on the Western Avenue side; that the work continued until February or March of the following year; that from August, 1891, the work constantly occupied all of the passageway in the rear of the buildings on the river side, so that the petitioner was deprived of the use of it entirely for six or eight months; that much more than the twenty-foot strip was occupied; that the petitioner paid, under protest, an entrance fee of $1,400 to the city to enter the State sewer, saving any rights the petitioner might have to recover it back; that the expense of constructing the connecting sewer built by the petitioner was $2,455.42, not including the entrance fee above mentioned; that the petitioner continued to drain into the river for some time after the State sewer was completed, until they received a letter, dated October 31, 1892, from the secretary of the board of health, containing the following: " I am directed by the board of health to say that it will be obliged to insist that you proceed at once to discontinue the discharge of drainage from the abattoir into the river "; that it was in consequence of the action of the board of health that the petitioner

stopped draining into the river; and that the business was not in fact stopped at any time.

Horace H. Moses, called as a witness by the petitioner, testified that he was a civil engineer, and had had long experience in cutting up tracts of land for various building and mercantile purposes for many years; and that he had been superintendent of sewers of the city of Boston for two years. After testifying generally to the effect of the taking by the State upon the development of the land and upon its value, he stated that it was an encumbrance upon the title of all the property covered by it, and if the strip taken was not adapted to any line of public highway it impaired the value of all the property traversed by it to the width of one hundred feet; that he had built sewers in all parts of the city, and had made for the city some unimportant takings; that he considered himself qualified to testify as an expert with regard to the effect of the building of a sewer upon a piece of land like the petitioner's; that he was not a real estate expert, and did not know the value in dollars and cents of the petitioner's land; and that he had had occasion to consider the effect of the location of sewers upon the value of tracts of land which he was developing. The witness was then asked by the petitioner the following question: "To what percentage of its value is this one hundred foot strip affected by that sewer?" Upon objection by the respondent, the judge ruled that the witness was not qualified to answer the question, and excluded it; and the petitioner excepted.

In the cross-examination of a witness for the petitioner, the counsel for the respondent, in reply to a statement by the petitioner's counsel that "You are stating an entirely incorrect proposition of law if you are stating that the Commonwealth is bound to keep a sewer there," made the following remark: "I think they have obligated themselves by the strongest sanctity of an act of the Legislature to keep this in; they are morally bound to keep it up and repair it."

The counsel's position upon this question was reiterated in his closing argument. Various experts called by the petitioner testified that the twenty-foot strip taken for the sewer was in a disadvantageous place for a permanent roadway and for the development of the property.

William H. Whitney, called as a witness by the respondent, testified that he had been a civil engineer a little over thirty years; that he had had experience in improving lands, building streets, lotting up lands in Boston and vicinity, mostly in Back Bay lands; that he had been consulted as an expert in regard to such matters constantly; that he knew the petitioner's land in Brighton; that he had made an examination of that land, and had spent one afternoon there two years ago in looking it all over, — looked the deeds over, and consulted plans at that time and some since; that he had made accurate drawings of the land from data furnished by the deeds and other sources, and made a study of the method of development of this tract of land in case it should cease to be used for the present purpose, and studied its possibilities; that in his judgment the best point of entrance for a street upon that territory, and practically the only one, on account of the grade of the land, was at the end nearest to Boston, very close to the river, at the point where the existing roadway goes in, because the front was very narrow, and because of the grade of the other streets it would be impracticable to enter anywhere else in that part of the land; that, in his judgment, the best point of departure of a road upon North Beacon Street was substantially the same thing because of the marsh land; that he had plotted the sewer location in the existing road in the course of his studies; that the location of the sewer was an advantageous line for a road for the development of that property; that considering the property as adaptable for manufacturing purposes, or for development for other purposes, the effect generally of the taking for the sewer made by the Commonwealth was certainly an advantage; that the advantage was clearly seen in the fact that it furnished ample drainage for the land and removed the filth, the accumulation of the filth in the river, which was a great injury to it; that on that point alone it more than overbalanced any trifling waste of the land that might occur; that he certainly saw an advantage, on the whole, to this land; that he had always been interested in the existing drainage scheme of the city of Boston, which was discharged at Moon Island before this sewer was built, and had made a study of it; that as a member of the board of health of Cambridge he became greatly interested in it and its duplication

on the north side of the river; that he had nothing to do with designing this system of sewerage or with the construction of it; that he did not think he could recall the sizes of the sewer through the abattoir property; that he did not know about what the size was nor how it was constructed; that he knew what the sizes were between the abattoir property and Moon Island; that where the west side intercepting sewer meets it at Gainsborough Street it had a capacity of seven feet in diameter virtually, and it increased somewhat in going towards Moon Island; that he had no personal knowledge of the size of the sewer above the abattoir property; that he did not know how the interior of that was constructed; that he had made a special study as to what ought to be done if it was necessary to supplement that sewer; that he had been called upon to make special investigation to determine what should be done in the way of increasing or supplementing this sewer, with reference to Cambridge, when he was a member of the board of health; and that that was after the lower part of the sewer was built, and after the sewer was opened for use for Boston proper, but before the sewer for its entire length was opened and before it was used by the "abattoir people." The witness was then asked by the respondent the following question: "Assuming that the sewer was constructed of the sizes shown on the plan before you and at the grades there shown from the point in Watertown to the connection with the city system at Huntington Avenue, for what length of time would it be adequate for the purpose for which it was designed?" The petitioner objected to this question upon two grounds; first, that the witness was not qualified as an expert upon the subject, and, secondly, that the question was not competent. The judge admitted the question, and the petitioner excepted. The witness answered: "I cannot fix it. Perhaps twenty years from this time it will have to be supplemented by something else, from my knowledge of the capacity of the sewer below Gainsborough Street." The witness was then asked by the respondent the following question: "Whether or not, in case that drainage scheme should become inadequate for the territory through which it goes, it would be reasonable or probable that this sewer should be enlarged in that portion which goes through the petitioner's property?" to which question the

petitioner objected. The judge overruled the objection, and the witness answered : " Both the location and the elevation of the new supplementing sewer would require it to be put in another place, and make a second sewer necessary at a higher elevation and in another part of Brighton, not in connection with this taking "; and the petitioner excepted.

Sidney Smith, called as a witness for the respondent, testified that he was city engineer of Rutland, Vermont, and had been an engineer in charge of the construction of this sewer, and had occasion to go to the ground of the petitioner nearly every day, sometimes twice a day, and was familiar with the grades ; that in his judgment the sewer would safely sustain a weight of three tons per square foot; that the necessity for repairs was very remote, — he should not expect it to be repaired inside of thirty or perhaps fifty years ; that work was done at night by direction of the commission in order to facilitate matters ; that the petitioner's business was slightly interrupted when the sewer was built through the entrance from Western Avenue, when the petitioner's teams had to come through a private way ; that all the drains of the abattoir were so arranged as to slope towards the Charles River; that if they had located the sewer through the road on the south of the buildings it would have been necessary either to change their entire arrangement of drainage and plumbing, so as to discharge on the south side of the buildings, or else build a sewer in the road, where the State sewer is built now, and lead that to the south ; that the work began in the petitioner's grounds about the 1st of July, and the entire work was not cleared up until April, but the sewer was in use and completed before that time ; that he should say that there was not a very large amount of territory of the petitioner occupied during the progress of the work; that usually the work was confined to the roadway through which the sewer was built; and that, while the work was going on, there was very little outside the twenty-foot strip occupied during the whole time.

The petitioner requested the judge to give the following instructions, which the judge refused to do, except so far as they appear in the instructions given :

" 1. Under the taking of the easement in the petitioner's land, which the Commonwealth made, it acquired the right, not only

to construct, operate, and maintain an underground main sewer, and connecting sewers, drains, manholes, and underground appurtenances, and to repair and renew the same in any part of the strip described in the taking, but also the right at any time to alter and change the surface of the land within the said strip, to dig up the surface and to appropriate the soil and gravel so far as reasonably necessary to carry out the plan and construct the work contemplated by the statute, to remove the said soil and gravel to any other part of the said system of sewers constructed under the statute, and to keep the surface of said strip in any condition which might be reasonably necessary or convenient for the maintenance of an underground sewer, and also the right to exclude the petitioner from the strip described in the taking, to fence the same if it should be at any time reasonably necessary or convenient so to do for the purpose for which the easement was taken.

"2. The petitioner, at the time of this taking, in March, 1891, had no right to enter such sewer as the Commonwealth might construct in its land. Whether it would or would not acquire the right would depend upon what terms, conditions, and regulations the city of Boston might establish in reference to entering the sewer, and whether it could agree with the city in reference to the sum which the city might require for the permission to enter. Under these circumstances it cannot be found that the petitioner has sustained any peculiar or special benefit by reason of the location of the sewer through its land which can be set off against the damages caused by the taking.

"3. (In case No. 2 is refused.) If the petitioner's right or opportunity of entering the sewer is the same kind of right or opportunity, and none other, which other people in the neighborhood may have who have no land taken, such right or opportunity would not constitute a special or peculiar benefit which should be set off against the damages caused by the taking.

"4. Special and peculiar benefit is not to be found from the special use which the petitioner makes of its property, or the business which it carries on.

"5. The Commonwealth is under no contract or obligation to maintain that sewer through the petitioner's land.

"6. If the petitioner's drain into Charles River and the sewers

of the territory of the Brighton district emptied into the same river, and by the adoption of this metropolitan drainage system the petitioner's sewage and that of Brighton district were turned into this sewer, the petitioner derived no special and peculiar benefit which can be set off against its damages.

" 7. If the benefit to the petitioner from the sewer was in having entrance to a permanent system of sewage disposal at tide water, and if this benefit was also received by estates generally in Brighton and adjoining towns, then there is no special or peculiar benefit which can be set off against the petitioner's damages.

" 8. As to the strip of land through which the sewer runs, or any lots which include any portion of said strip, the petitioner cannot legally make a conveyance free and clear of encumbrance, but must convey subject to the easement acquired by the Commonwealth, and this easement is a cloud upon the title to any such lots."

The judge instructed the jury, among other things, as follows:

" You ought to say that the Commonwealth will always act reasonably about it [the sewer], and that in making repairs or doing anything upon it they can do whatever is reasonable and proper in doing it, and that they will do nothing to molest or trouble the petitioners, except what is proper and reasonable, and that is the view you ought to take of the condition of the two parties. If there should be at any time a break in the sewer, they would have a right to go there and repair it; if necessary to stop people's going across the place where the repairs were in progress, to fence it up temporarily for that purpose, or to do anything which you would appreciate would be reasonable and proper in making those repairs. You ought also, in considering how the interruption will be liable to be, to consider what the sewer is and how it is constructed; its permanence or its lack of permanence; the material of which it is constructed, and the manner in which it is constructed. That all bears upon the question of liability to interruption or otherwise. . . .

" The respondent takes the ground that there was a peculiar and special benefit to the petitioner, not shared in by the general community, and in order to give you any aid on that subject I ought to state that so far as the community there have had the

benefit of the sewer which they needed, so far as they have all had that benefit generally shared in by that community, no benefits by way of set-off can be set up or allowed, and it is only the peculiar and special benefits which the petitioner has received that can be considered. . . .

" The Commonwealth claims, this being a piece of land of forty-five acres, that that sewer has been so placed in it, and is so run through it, that it has given it a peculiar and special benefit, and that it is worth a great deal more to the petitioner than if it had been put to one side or run through one corner, or run off from the land, and therefore in that manner it has made the land more valuable, and is a peculiar and special benefit. On the other hand, the petitioner says that is all wrong, that it is not so at all, that it would have been a great deal better if it had gone outside of the entire land, and would not have damaged them half so much. Now, all I have to say is, if you find that the Commonwealth's contention is the true one, — that must be first settled, — and that by going through this land they have conferred a peculiar and special benefit upon the land, and therefore upon the petitioner, then you may consider it as a peculiar and special benefit; but first you must determine how you find on that question. If you take the petitioner's view of it, then there is no special and peculiar benefit. If you take the Commonwealth's view of it, then you may find a special and peculiar benefit.

" There is one other ground upon which the Commonwealth claims there should be a set-off by way of a benefit. It claims that this corporation had erected large and valuable works there for the purpose of slaughtering and melting, and that they needed great facilities for sewerage, and that there was every reason to believe that in the near future that would be cut off from them, they could not have them, they would have to stop their work, and they could not go on, and it claims that putting through this sewer there upon their land which it has appropriated for this work under this street, which they were actually using, gave to that business which they were conducting a peculiar and special benefit, and it holds that that is entitled to be considered a benefit. The petitioner says, on the other hand, that is all a fallacy; that there is nothing in it; that they had all

the accommodations they wanted before, and as to this talk about the Legislature complaining and people complaining about a nuisance, they had plenty of conveniences for sewerage purposes by going through different sewers into the Charles River, and they had a right to anticipate that, whenever that would be stopped, the city of Boston would furnish them other sewerage. The respondent says, 'You required this; you could not carry on your business until you had this accommodation with sewers, and at just the right time the Commonwealth came on and put in a sewer, not only to accommodate you to-day, but to accommodate you for all time with this business, and to get rid of the nuisance which you were creating.' Now, if you take the petitioner's view, and find that it has the correct view of it, then there are no special and peculiar benefits to the petitioner. If, on the other hand, you take the Commonwealth's view, and find that by the manner of constructing this sewer through the petitioner's ground, that was a special and peculiar benefit to their business where it was constructed, in the manner and way it was constructed, which helped them to get rid of sewage, and thereby became a special benefit to them, then you may consider it as within that class."

The following questions were submitted to the jury:

"1. Was the location of the sewer through the petitioner's land a special and peculiar benefit to it by reason of the way and direction in which it ran through its land from one end of its length to the other?

"2. Was the location of the sewer through the petitioner's land a special and peculiar benefit to it beyond that generally enjoyed by others, by reason of the fact of the peculiar business to which its buildings were adapted?"

The jury answered these questions in the affirmative, and returned a verdict for the petitioner in the sum of one dollar; and the petitioner alleged exceptions.

The case was argued at the bar in March, 1897, and afterwards was submitted on briefs to all the justices.

*R. M. Morse & E. A. Whitman,* for the petitioner.

*W. D. Turner,* for the Commonwealth.

KNOWLTON, J. The first question is whether Moses, a civil engineer called by the petitioner, should have been permitted to

answer the question, " To what percentage of its value is this hundred-foot strip affected by that sewer? "   The witness had testified that he was not a real estate expert, and did not know the value in dollars and cents of the petitioner's land.   He had testified generally to the effect of the taking upon the development of the land and upon its value.   The hundred-foot strip referred to in the question was the land along the road through which the sewer was laid, which the witness said would be impaired in value by the taking, if the strip taken was not adapted to use for a public highway.   There was contradictory evidence as to the question whether it was adapted to such a use.   Without determining whether the judge might properly, in the exercise of his discretion, have permitted the question to be answered, we think it clear that there was no error of law in excluding the evidence.   The evidence related only to a part of the land, and the effect of the taking upon that part would be entirely different if the line of the sewer was adapted to use as a street from the effect if it was not.   The question did not direct the attention of the witness to the hypothesis upon which his answer was to be founded, and so far as appears the witness had no opinion in regard to the question which hypothesis was true.   In several particulars the case is different from *Whitman* v. *Boston & Maine Railroad,* 7 Allen, 313, 328, in which the witness was familiar with the lands in the vicinity, and had had personal experience for a long time in the use of the easement which was destroyed by the taking.

The first of the answers of the witness Whitney, to which exception was taken, did the petitioner no harm.   The questions were directed to the contention of the petitioner in argument, that the sewer just constructed would, in a few years, become inadequate for the drainage of the territory through which it passes, and that it would then become necessary to take it up and build a larger one.   His first answer was in accordance with the first part of the petitioner's contention, with a statement that he could not fix the time within which it would be necessary to make further provision for the drainage, and that it might be within twenty years.   Certainly the petitioner could not complain of this answer.

His answer to the second question was not objectionable.   The

evidence tends to show that he had given a great deal of study to the subject which he was then considering, and that he was a competent expert. His answer, that " both the location and the elevation of the new supplementing sewer require it to be put in another place, and make a second sewer necessary at a higher elevation and in another part of Brighton, not in connection with this taking," was important for the consideration of the jury. The fact, if it was a fact, and if it was not admitted, was a proper subject for proof, and it was a matter in which the study and experience of the witness would greatly aid him in forming a valuable opinion. We think that this evidence was rightly admitted.

The instructions given in regard to the matters referred to in the petitioner's requests were correct and sufficient. The petitioner contends that the jury should have been told that the Commonwealth may at any time hereafter remove the soil, sand, and gravel to another part of the system of sewers constructed under the statute, and in support of this contention it cites *Titus* v. *Boston*, 149 Mass. 164. The facts on which that case was decided are very different from those in the case at bar. The city of Boston had been authorized to build and maintain wharves, pumping works, and reservoirs for a sewer on the main land at or near the mouth of Neponset River, and also to build and maintain a reservoir or reservoirs at Moon Island, and other works essential to a proper and convenient discharge of the contents of the sewer, which was to be a main sewer carrying the drainage of the city of Boston. It had the right to take such lands, buildings, wharves, and structures as might be necessary to accomplish the objects of St. 1876, c. 136, §§ 1, 2. It took the whole of Moon Island, the area of which is about thirty-five acres. It was held that this taking for purposes of construction gave the city the right to carry the loam and gravel excavated in making the reservoirs to the main land, to be used in construction there. Such a use of the property seems fairly to have been contemplated by the statute and the taking under it.

In the present case the statute authorized the taking of " any lands, watercourses, rights of way, or easements " necessary to carry out the provisions of the act. St. 1890, c. 270. The ease-

ment taken in the lands of the petitioner was merely "the right to carry and conduct, under the following described lands, and therein to construct, operate, and forever maintain an underground main sewer, and connecting sewers, drains, manholes, and underground appurtenances, and to repair and renew the same." The rights of the Commonwealth are limited to the easement taken. It is not reasonably necessary for the maintenance of the main sewer to remove the soil from one part of the system to another in repairing and renewing the sewer, and no right so to do is included in the taking. In this particular the work to be done is so unlike the work of repairing, maintaining, and reconstructing highways, that there is but little analogy between them. The request had reference only to the rights of the Commonwealth to use the land in repairing and renewing the sewer, and we are of opinion that there was no error in this part of the charge.

The exceptions do not show such facts as made it the duty of the judge to give the fifth instruction requested by the petitioner. The respondent did not contend that the Commonwealth was under a contract to maintain this sewer through the petitioner's land. All that the respondent's counsel contended was that the Commonwealth was bound, by the sanctity of a moral obligation, not to abandon this great work which it has constructed at an enormous cost, that must be paid by the people residing in the neighborhood. We think that the argument was legitimate.

The only remaining exceptions relate to the instructions and the refusals to instruct in regard to the set-off of benefits to the land of the petitioner. It is contended that there were no such benefits that could be set off; but it appears that the sewer was constructed through the petitioner's land in a place which has long been used as a way, and which many witnesses testified was specially adapted to use as a public highway. The petitioner might acquire a right to enter the sewer with its private drains, upon such terms, conditions, and regulations as the proper public authorities might establish. In fact, it has so entered the sewer. St. 1889, c. 439, § 9. The location of the sewer lengthwise through the tract of land has reduced to a minimum the length of the particular drains necessary to connect different

lots with the sewer, and has made it easy and comparatively inexpensive for the petitioner to drain every part of its land. The jury might find this to be a special and peculiar benefit, which might be set off against the damages, even though other lands received similar benefits. *Allen* v. *Charlestown*, 109 Mass. 243. *Hilbourne* v. *Suffolk*, 120 Mass. 393. *Donovan* v. *Springfield*, 125 Mass. 371. The general doctrines applicable to this part of the case were correctly stated and sufficiently explained to the jury.

There was evidence from which the jury might have found a special and peculiar benefit to the property, growing out of a special use to which it was adapted. A large number of buildings have been erected upon it, designed to be used in killing and dressing animals intended for food, and in rendering into useful products the parts unsuitable for food in their natural state. Previously to the construction of the sewer the drainage from these buildings was conducted into the river. There was evidence from which the jury might have found that this drainage was creating a nuisance, and that it would have been impossible for the petitioner to continue using the property in this business if the sewer had not been built. The jury might also have found that the real estate, including the erections upon it, was much more valuable for this use than for any other. The petitioner contends that the jury were erroneously instructed in regard to benefits in reference to this use. If the jury had been permitted to set off benefits to the business of the petitioner, as distinguished from benefits to the real estate in view of its adaptedness to this business, it would have been erroneous. There are expressions in the charge which, taken by themselves, might indicate that benefit to the petitioner's business was to be considered; but when we consider all that was said upon the subject, we are of opinion that the jury must have understood that they were to consider the business only so far as the value of the real estate and the benefits received by it were affected by its adaptedness to be used in that business. A question which the jury were instructed to answer was in these words: " Was the location of the sewer through the petitioner's land a subject of peculiar benefit to it, beyond that generally enjoyed by others, by reason of the fact of the peculiar business to

which its buildings were adapted?" This called attention to
the real estate, and not to the business in which the petitioner
happened at that time to be engaged. See *Maynard* v. *North-
ampton*, 157 Mass. 218, 219, and cases cited. The whole charge
is to be considered, so far as it relates to this subject, and the
language must be understood as correctly presenting the question
whether, by reason of the large and valuable works erected upon
the land, it was adapted to a particular use for which its value
was specially increased after the construction of the sewer, on
account of the additional facilities for drainage afforded by the
sewer.

In the opinion of a majority of the court, the entry
should be　　　　　　　　　　　　　　　*Exceptions overruled.*